MARY EMMA LUMPKIN ET AL., RESPONDENTS, v. SHEIDLEY REALTY COMPANY ET AL., BANKER'S INDEMNITY INSURANCE COMPANY, INSURER, APPELLANTS.—53 S. W. (2d) 386.

Kansas City Court of Appeals. July 5, 1932.

*Mont T. Prewitt* and *Wm. T. Alford* for respondent.

*Martin, Scheufler & Carbaugh* for appellant.

BOYER, C.—This is an appeal from the judgment of the circuit court affirming an award made by the Workmen's Compensation Commission. The claimants are the widow and the minor child of Wayne Lumpkin who met his death by accident October 4, 1930. He was an employee of defendant company, and the Bankers' Indemnity Insurance Company was the insurer. A timely claim in usual form was presented to the commission to which the employer and insurer made answer. All the statements of the claim were admitted except it was denied that the deceased was receiving a commission in addition to salary, and the defendants denied "that said death arose out of and in the course of said deceased's employment." The evidence was received by a single commissioner who made an award in favor of claimants in which $150 was allowed as burial expenses and the sum of $11.36 a week for 300 weeks to the widow until death or remarriage and the unpaid remainder, if any, to the minor child as her interest might appear. On application for review by the full commission the award thus made was affirmed by two members of the commission, the third member dissenting.

Among other findings of fact, it is stated that the accident arose out of and in the course of the employment. The central question in the case is whether there was sufficient competent evidence to support the award and the finding above mentioned. The amount allowed is not in dispute. It is insisted by appellants that the evidence was insufficient to support the finding that the accident arose out of and in the course of employment.

The abstract of the evidence shows that at the time in question defendant realty company was operating a public garage in a large building of fifteen levels, all connected by ramps. The place was used primarily for the purpose of parking automobiles or for storage. The entrance led to the main floor where the offices, rest rooms, and gasoline pumps were located. A large number of automobiles were handled and various employees were engaged to do the work. The company had a manager and an assistant manager, and in their absence certain other employees were left in superintending control. The deceased and a number of others were employed chiefly to receive and deliver cars and to drive them from place to place in the building. Wayne Lumpkin had been employed in this work for about a month, and for

some time prior to the accident had been working in the nighttime from seven o'clock in the evening until seven o'clock in the morning. His duties were to drive cars until twelve o'clock, at which time the main doors of the garage were closed and thereafter he would be engaged in cleaning up the first floor and the other levels of the building. On the night in question there were three employees at the place of business until twelve o'clock. At that time the man who was in charge departed and left one Harrington as the "straw boss" in charge of the place. After twelve o'clock, Harrington and Lumpkin worked for two hours or longer in sweeping and cleaning the main floor of the building. This was the usual custom, and after that work was performed it was then the duty of Lumpkin to devote his time to cleaning some of the upper levels. After the first floor was cleaned, Harrington and Lumpkin separated. Some time thereafter Harrington went by elevator to some of the upper levels and shortly after his return to the ground floor and at about three o'clock A. M., he saw Lumpkin on a motorcycle coming down the ramp from the second to the first floor. For some reason the motorcycle jumped an eight-inch curbing at the side of the ramp and Lumpkin was thrown off and fell over the ramp to the basement floor and the motorcycle fell upon him. He died either instantly or within a very short time.

The motorcycle in question had a sidecar attachment and was the property of the Royal Typewriter Company. By special arrangement it had been parked at a particular place on the ground floor which was not large enough for an automobile. There is evidence offered by defendants that by special arrangement between the manager of the garage and the typewriter company the latter was permitted to park its motorcycle at the place designated. It was to be parked and removed by the owner's driver, and no one else was to handle the motorcycle. According to custom the employee of the typewriter company who operated the motorcycle took it to the garage and parked it in its usual place at about five or five-thirty P. M., on October 3, 1930. There is also evidence that there was no other motorcycle stored, parked, or kept in the garage except one belonging to an employee who occasionally had it there. There is evidence that all of the employees of the garage were instructed not to handle or drive the motorcycle of the typewriter company and that they were not to touch it, but this is controverted. There is evidence that before the accident the motorcycle in question had not been on any other floor in the garage except when operated by its own driver who took it on different occasions to an upper floor where he washed it and returned with it. The tires of the motorcycle had been repaired on different occasions at that place, but it does not appear that the motorcycle was moved to any other floor for that

purpose. Wayne Lumpkin at one time owned a motorcycle of his own, but did not own one at the time of the accident. There was no one else in the building at the time except the two men named.

Harrington testified that the motorcycle was about eight feet down the ramp when he first saw it; that he heard it "just a minute" before it came into sight; that he did not recall seeing the motorcycle at any time that night before; Lumpkin was on the machine; "it was normally kept on the first floor." "Q. And in connection with the duties of Wayne Lumpkin, was it part of his duties to clean on the second floor where this motorcycle came from and move it down to the first floor if it had been out of its usual first floor place? A. Yes, sir, if it was necessary to move it he had the authority." He had not given instructions to any one to do anything to the motorcycle; he had never seen Lumpkin start the engine or move the motorcycle before. Witness did not sit in any meeting where instructions were given by the assistant manager; he did not know how the motorcycle happened to be on the second floor; there was another boy there until midnight; if the motorcycle had been taken up he might or might not have known it because he was busy going up and down with cars until midnight. He did not instruct Lumpkin to move the motorcycle. "If this machine had been on the second floor there, I would say he would have had the right to move it. . . . He could move it out of the way. . . . There had been no instructions given about that motorcycle. . . . He had received his directions on the work he was to do from Mr. Baker in regard to taking care of these floors upstairs." Mr. Baker was the assistant manager. There were no orders to witness not to move or touch this motorcycle until after the accident. This witness admitted that he had signed a statement in which it was recited that there was no reason for Lumpkin to move the motorcycle; that it was on the north side of the main floor and in no way interfered with the progress of the work, and that Mr. Baker instructed him and Lumpkin never to move the motorcycle. Witness testtified that these statements were not true, as well as a statement signed by him and six other employees. He said they were signed because he was asked to sign them and because he was still working there and wanted to hold his job.

Mr. Baker, the assistant manager, testified to the arrangement between him and the Royal Typewriter Company about parking the motorcycle in the garage; that the driver of it was to drive it in, store it, and take it out, and that all employees were instructed not to handle it, and that the garage did not have a driver to handle it; that the motorcycle was not moved at any time to his knowledge; one of his night managers owned a motorcycle. This witness identified a copy of the report of the accident which was signed by him and

which he said was sent to the insurance company. But he identified a copy of the report in the hands of the commission as the same report. This appears to have been made upon the usual form prepared for that purpose. It is addressed to the Missouri Workmen's Compensation Commission and contains a report of the accident. The report is in the usual form of questions and answers and gives the names and addresses of the employer, the employee, the insurer, date of the accident, and other information. Question 22 and the answer are as follows:

"Describe in full how accident happened: While driving motorcycle with side car from 2nd floor of garage to 1st floor to be delivered to customer—coming down incline he applied brakes which threw the cycle to the left going over the wheel gard and fell to the ramp entering basement."

The full report was offered and received in evidence without objection. It is dated October 6, 1930, and states it was made out by L. W. Baker and is signed "Foreman, L. W. Baker."

Mr. Baker admitted an interview with a newspaper reporter about the accident, but denied the facts as stated in the news article on the subject in which it was stated that Lumpkin had worked at the garage a month and had moved motorcycles before, and was taking the cycle to the first floor so it would be ready for the Royal Typewriter Company, owner, promptly that morning.

The driver for the Royal Typewriter Company testified that he placed the motorcycle as usual in its stall at about five-thirty the evening before the accident; that at times he obtained gasoline at that place, had repairs made, took it to the thirteenth floor to wash it, but never left it on the second floor. Two other employees of defendant testified, but their evidence adds nothing to what has already been stated.

In addition to other findings, the commission found that the accident arose out of and in the course of the employment, and that the employee was driving a motorcycle from the second floor to the first floor of the garage when he lost control of the cycle and fell to the floor below.

## OPINION.

The decisive question is whether there was substantial evidence to support the finding of the commission that the accident arose out of and in the course of the employment. Where the evidence is conflicting on the issue of whether an accident arises out of and in the course of employment a question of fact is involved for the determination of the commission alone. [Sawtell v. Stern Bros. & Co., 44 S. W. (2d) 264, 267; Leilich v. Chevrolet Motor Co., 40 S. W. (2d) 601, 604.] That function is definitely committed to the

triers of fact and no court can weigh the evidence. [Section 3342, Revised Statutes 1929.] This is a feature of the compensation law that draws adverse criticism, but relief must be sought in the legislative forum. Even though it might reasonably appear that the decision is against the weight of the evidence, a majority of the commission determined the controlling question of fact against appellants and not without substantial evidence to support the finding.

The report of the accident was dictated by the assistant manager and signed by him two days after the casualty. It recites that the accident happened to the deceased while he was driving a motorcycle from the second floor to the first floor to be delivered to a customer. This is evidence that the employee was performing work within the scope of his employment, and it is not wholly unsupported by other testimony from which it might be inferred that the employee had authority to move the motorcycle. The accident report was received in evidence without objection. There is a suggestion that its contents are not binding on the defendant company because there is no showing that Baker had authority to sign the report. He was the assistant manager and signed the report as foreman. It was the duty of the employer to make a report under penalty. [Section 3332, Revised Statutes 1929.] There was no other report made, and there was no effort in the hearing to deny the authority of Baker to make the report in behalf of his company. It will be presumed that the employer complied with the statute and that the report filed was in compliance with its provisions. If there is anything in a report of an accident in the nature of an admission against the interest of the employer it is admissible in evidence the same as any other admission of like kind. The report of the accident in this case is competent evidence, especially in the absence of objection. The St. Louis Court of Appeals has recently dealt with the subject in the case of Lamkins v. Copper-Clad Malleable Range Corporation, 42 S. W. (2d) 941, 943, wherein the learned judge writing the opinion says:

"We think that the offer of the report in this instance is analogous to the offer in evidence of a pleading of a party and admissible and binding in the same way concerning admissions against interest."

Numerous authorities are cited. In a case recently decided by this court where the competency of narrations was in question, Judge BLAND said in Floyd v. A. Y. McDonald Mfg. Co., 46 S. W. (2d) 255:

"It is unnecessary for us to say whether these narrations were competent, for the reason that, assuming that they were not competent, there was sufficient evidence to support the award contained in the report made by Olson to the Workmen's Compensation Commission."

Following the above, many authorities are listed. On the subject

of the admissibility of an employer's report as evidence see Schneider on Workmen's Compensation Law (2 Ed.), vol. 2, sec. 515, for comment and collated case. It is held that such reports are admissible, evidential in value, and prima-facie proof of the statements which they contain.

In view of all the evidence in this case, we are constrained to hold that there was some substantial proof that the employee was engaged in endeavors incidental to his employment, and that the finding of the commission that the accident arose out of and in the course of the employment is supported by the evidence. The trial court was not in error and the judgment sustaining the award should be affirmed. The Commissioner so recommends. *Campbell, C.,* concurs.

PER CURIAM:—The foregoing opinion of BOYER, C., is adopted as the opinion of the court. The judgment is affirmed. All concur except, *Arnold, J.,* absent.